Jeffrey SPANIERMAN, Plaintiff,

v.

Abigail L. HUGHES, Anne Druzolowski, and Lisa Hylwa, Defendants.

No. 3:06CV01196(DJS).

United States District Court, D. Connecticut.

Sept. 16, 2008.

John R. Williams, New Haven, CT, for Plaintiff.

Jane B. Emons, Margaret Q. Chapple, Attorney General's Office, Hartford, CT, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Jeffrey Spanierman ("the Plaintiff") brings this action against the defendants, Abigail L. Hughes ("Hughes"), Anne Druzolowski ("Druzolowski"), and Lisa Hylwa ("Hylwa") (collectively, "the Defendants"), pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the First and Fourteenth Amendments to the United States Constitution. Now pending before the court is the Defendants' motion for summary judgment (dkt.# 31) pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."). For the reasons that hereafter follow, the Defendants' motion for summary judgment (**dkt.# 31**) is **GRANTED.**

### I. FACTS

On January 2, 2003, the State of Connecticut, Department of Education ("DOE") hired the Plaintiff to be an English teacher at Emmett O'Brien High School ("Emmett O'Brien") in Ansonia, Connecticut. At all times relevant to this case: (1) Hughes was employed by the DOE as the Superintendent of the Connecticut Technical High School system, of which Emmett O'Brien is a part; (2) Druzolowski was employed by the DOE as the Assistant Superintendent of the Connecticut Technical High School system; and (3) Hylwa was employed by the DOE as the principal of Emmett O'Brien. The Plaintiff was part of a union that had a collective bargaining agreement ("the Agreement") with the DOE. Under the Agreement, a teacher reaches tenure after completing four years of full-time service.

This case involves the Plaintiff's use of MySpace.com ("MySpace"), a website that allows its users to create an online community where they can meet people. MySpace can be used to share photographs, journals, and "interests" with mutual friends. People with MySpace accounts can create a "profile," to which they can link their friends, and the owner of the profile can either invite people to become friends, or other MySpace users can ask the owner of the profile to become friends with the owner of the profile. If the owner

of a profile accepts another MySpace user as a friend, the friend's profile picture is posted on the profile owner's MySpace page, along with a link to the friend's MySpace profile. The owner of a profile can kick friends off his profile, deleting that friend's profile picture from the owner's profile page. In addition, a profile owner can completely block other MySpace users from viewing his profile page. The owner of a profile can post blogs on his own profile page, allow other MySpace users to post comments on his profile page, or post comments on other users' profile pages.

The Plaintiff originally began to use MySpace because students asked him to look at their MySpace pages. The Plaintiff subsequently opened his own MySpace account, creating several different profiles. One of his profiles was called "Mr. Spiderman," which he maintained on MySpace from the summer of 2005 to the fall of 2005. The Plaintiff has testified that he used his MySpace account to communicate with students about homework, to learn more about the students so he could relate to them better, and to conduct casual, non-school related discussions.

Elizabeth Michaud ("Michaud") was a guidance counselor at Emmett O'Brien. In the fall of 2005, Michaud spoke with Francesca Ford ("Ford"), a teacher at Emmett O'Brien, who informed Michaud that the Plaintiff had a profile on MySpace. Michaud alleges that she also received student complaints about the Plaintiff's profile page. After her conversation with Ford, Michaud viewed the Plaintiff's "Mr. Spiderman" profile page, reviewing it for about a half hour. Michaud has testified that she was disturbed by what she saw on the Plaintiff's profile page. According to Michaud, the Plaintiff's profile page included a picture of the Plaintiff when he was ten years younger, under which were pictures of Emmett O'Brien

students. In addition, Michaud stated that, near the pictures of the students were pictures of naked men with what she considered "inappropriate comments" underneath them. Michaud further testified that she was disturbed by the conversations the Plaintiff was conducting on his profile page. Michaud stated that the Plaintiff's conversations with Emmett O'Brien students were "very peer-to-peer like," with students talking to him about what they did over the weekend at a party, or about their personal problems. Michaud felt that the Plaintiff's profile page would be disruptive to students.

After viewing the Plaintiff's "Mr. Spiderman" profile page, Michaud spoke with the Plaintiff about his email communications with students about things that were not related to school, and suggested that he use the school email system for the purpose of educational topics and homework. Michaud also told the Plaintiff that some of the pictures on his profile page were inappropriate. After Michaud spoke with the Plaintiff, he deactivated the "Mr. Spiderman" profile page. The Plaintiff then created a new MySpace profile on October 14, 2005 called "Apollo68."

Ford subsequently discovered the Plaintiff's new profile page and informed Michaud of it. The Defendants also allege that Emmett O'Brien students complained to Ford about the Apollo68 profile. Michaud and Ford separately viewed the "Apollo68" profile and came to the conclusion that it was nearly identical to the "Mr. Spiderman" profile. The Plaintiff admits that the "Mr. Spiderman" profile and the "Apollo68" profile had the same people as friends and included the same types of communications.

Michaud reported the existence of the "Apollo68" profile page to her supervisor, Debbie Anderson, the Director of Guidance. Michaud was then told to report the situation to Hylwa and to make sure that

the Plaintiff had union representation. In November 2005, Hylwa met with the Plaintiff, explained that there would be an investigation, and placed the Plaintiff on administrative leave with pay. The Plaintiff deactivated the "Apollo68" profile when he was placed on administrative leave.

Rita Ferraiolo ("Ferraiolo"), an Education Labor Relations Specialist with the DOE, was assigned to investigate the Plaintiff's MySpace profiles. During the investigation, Ferraiolo obtained a list of the friends associated with the "Apollo68" profile. She was able to match several of the friends' profiles with Emmett O'Brien students. Ferraiolo also obtained comments posted on the "Apollo68" profile page, comments made by the Plaintiff on other individuals' MySpace profile pages, and blog entries posed by the Plaintiff on his own profile page.

On January 13, 2006, Ferraiolo met with the Plaintiff, the Plaintiff's union representative, and Hylwa to discuss his MySpace activities. At this meeting, the Plaintiff had the opportunity to explain his MySpace profiles. On March 30, 2006, Hylwa sent a letter to the Plaintiff explaining that he had exercised poor judgment as a teacher. That same day, Druzolowski sent a letter to the Plaintiff informing him that the DOE would not renew his contract for the 2006–2007 school year. The Plaintiff then requested a hearing. Thus, on April 26, 2006, the Plaintiff and his attorney met with Hughes and Ferraiolo. The Plaintiff and his attorney were allowed to present evidence at this hearing. Despite the Plaintiff's efforts, Hughes ultimately agreed with Druzolowski's decision not to renew the Plaintiff's contract. The Plaintiff received his pay and benefits until the end of the summer of 2006, when his contract with the DOE for the 2005–2006 school year expired.

## II. DISCUSSION

The Plaintiff has brought this action against the Defendants in their individual and official capacities pursuant to 42 U.S.C. § 1983, alleging that they violated his Fourteenth Amendment rights to procedural due process, substantive due process, and equal protection. The Plaintiff also alleges that the Defendants violated his First Amendment rights to freedom of speech and freedom of association. Title 42, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...."

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir.1999).

The Defendants argue that all of the Plaintiff's claims fail as a matter of law. The court shall analyze the parties' arguments seriatim.[1]

---

1. The Defendants have moved for summary judgment on all claims in the complaint. In the complaint, the Plaintiff mentions his November 28, 2005 suspension, a reprimand letter dated March 30, 2006, and the March 30, 2006 letter informing him that his employment contract would not be renewed. The

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56.

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

court notes that, although all three of these incidents could have been used to support the Plaintiff's claims, the parties, in their summary judgment memoranda, discuss only the non-renewal of the employment contract. As a result, the court's analysis shall focus solely on the non-renewal of the employment contract, and the court shall consider all claims with regard to those other incidents abandoned. *See Farrar v. Town Of Stratford*, 537 F.Supp.2d 332, 356 (D.Conn.2008).

## B. FOURTEENTH AMENDMENT

The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. § 1. The Plaintiff claims that the Defendants deprived him of his Fourteenth Amendment rights to procedural due process, substantive due process, and equal protection.

### 1. Procedural Due Process

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see Patterson v. City of Utica*, 370 F.3d 322, 329 (2d Cir.2004) ("The Due Process Clause of the Fourteenth Amendment requires that, generally, a person must be afforded the opportunity for a hearing prior to being deprived of a constitutionally protected liberty or property interest."); *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 164 (2d Cir.2001) ("*NOW*") ("[P]rocedural due process protects only important and substantial expectations in life, liberty, and property"). As the Supreme Court has maintained, although " '[l]iberty' and 'property' are broad and majestic terms," *Roth*, 408 U.S.

at 571, 92 S.Ct. 2701, "the range of interest protected by procedural due process is not infinite," *id.* at 570, 92 S.Ct. 2701.

■■■ The Plaintiff claims that his interest in the renewal of his teaching contract rises to the level of those encompassed by the Fourteenth Amendment's protection of "property." "The Fourteenth Amendment due process guarantee . . . only extends to property claims to which an individual has a 'legitimate claim of entitlement.' " *NOW*, 261 F.3d at 164 (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. 2701). That is, the Plaintiff must demonstrate that he possessed "a property interest of constitutional dimension." *Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir.1998). "A cognizable property interest is more than just a 'unilateral expectation,' " *id.*, for procedural due process does not protect "trivial and insubstantial interest[s]," *Ezekwo v. NYC Health & Hosps. Corp.*, 940 F.2d 775, 783 (2d Cir.1991). Indeed, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it." *Roth*, 408 U.S. at 577, 92 S.Ct. 2701. "In the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause*." *S & D Maint. Co., Inc. v. Goldin*, 844 F.2d 962, 967 (2d Cir.1988) (emphasis in original).

The court finds that the Plaintiff did not have a protected property interest in his employment at Emmett O'Brien. It is undisputed that the Plaintiff did not have tenure. In addition, the court notes that this case does not involve a "termination" of, or a "dismissal" from, employment. Instead, this case involves the non-renewal of the Plaintiff's employment contract. The relevant question here is whether, upon the completion of the school year and without cause, the DOE could decline to renew the Plaintiff's non-tenured employment.

The Plaintiff argues that Conn. Gen. Stat. § 10–151 ("Teacher Tenure Act") provided him a protected property interest. The court believes, however, that the Plaintiff's reliance upon the Teacher Tenure Act is misplaced. The Plaintiff's employment was governed by the Agreement into which his union and the DOE entered. If a conflict were to exist between the Agreement and the Teacher Tenure Act, the Agreement would be controlling because, under Connecticut law, "[w]here there is a conflict between any agreement or arbitration award . . . on matters appropriate to collective bargaining . . . and any general statute or special act, or regulations adopted by any state agency, the terms of such agreement or arbitration award shall prevail. . . ." Conn. Gen.Stat. § 5–278(e).

With regard to the non-renewal of a non-tenured employee's contract, Article 15 of the Agreement reads as follows: "Written notice of non-renewal of a non-tenured employee's contract will be sent not later than April 1. . . . Such employee may, upon written request filed with the Superintendent within ten (10) days after receipt of such notice, be entitled to a hearing before the Board's designee, who will be the Superintendent or the Chief of the Bureau of Human Resources." (Dkt.# 31, Ex. 20.)[2] There is nothing in

2. Article 13 of the Agreement discusses dismissals from employment, and 2 under the express terms of Article 13, tenured employees and non-tenured employees with more than two years of service cannot be dismissed except for just cause. (*See* dkt. # 31, Ex. 20.) It is clear, then, that if the Plaintiff had been "dismissed" from his employment, just cause would have to be shown. The court reiterates, however, that this case involves the nonrenewal of an employment contract, not a termination of, or dismissal from, employment. As such, Article 15 of the Agreement, which discusses the nonrenewal of non-tenured employee contracts, governs the situation here.

the Agreement indicating that the non-renewal of a non-tenured teacher's contract can be done only for just cause. From what the court can discern, the DOE need only send notice to the Plaintiff by the first day of April (which it did) for such a non-renewal to take effect, and provide the Plaintiff with a hearing if requested (such a hearing was requested and provided). Thus, despite whatever unilateral expectations he may have held, the Plaintiff had no "legitimate claim of entitlement" to a renewal of his employment contract with the DOE.

The court also points out that, even in applying the terms of the Teacher Tenure Act, the Plaintiff's procedural due process claim still fails. With regard to non-tenured teachers, the Teacher Tenure Act reads as follows:

> The contract of employment of a teacher who has not attained tenure may be terminated at any time for any of the reasons enumerated in subdivisions (1) to (6), inclusive, of subsection (d) of this section; otherwise the contract of such teacher shall be continued into the next school year unless such teacher receives written notice by April first in one school year that such contract will not be renewed for the following year.

Conn. Gen.Stat. § 10–151(c). The first part of the statute directs that a non-tenured teacher's employment contract can be terminated at any time for any of the reasons listed in subdivisions (1) to (6) of subsection (d), which is the subsection governing the termination of the contracts for tenured teachers. That is, under the statute, the contract of a non-tenured teacher can be terminated for the same reasons that apply to the terminations of tenured teachers' contracts.

The Plaintiff, using this first part of the statute, argues that he had a protected property right because his employment was not to be "terminated" except for the reasons listed in subdivisions (1) to (6) of subsection (d). This argument is without merit. First, as the court has pointed out, this case involves a non-renewal of a contract, not a "termination." The statute distinguishes these two concepts. Second, if the Plaintiff's argument were true, there would be no need for the statute to make a distinction between tenured and non-tenured teachers. Under the Plaintiff's logic, non-tenured teachers can be dismissed only in the same manner and for the same reasons as a tenured teacher. Such reasoning would nullify the benefits of tenure. The court cannot support such an unreasonable position.

Third, and most importantly, the relevant portion of the statute (i.e., the portion concerning non-renewal of employment contracts), which the Plaintiff has ignored, goes on to read that "otherwise the contract of such teacher shall be continued into the next school year unless such teacher receives written notice by April first in one school year that such contract will not be renewed for the following year." *Id.* That is, other than terminating a non-tenured teacher's contract in the same manner as that of a tenured teacher, the DOE can simply not renew the contract, provided that the teacher receives written notice by the first of April. Similar to the Agreement,[3] the Teacher Tenure Act does not state that the non-renewal of

---

3. Indeed, the Agreement and the Teacher Tenure Act are very similar with regard to how non-renewal of a contract is enacted, and both allow for a non-tenured teacher to receive a hearing if requested. One difference between the two seems to be that the Agreement requires the written notice of non-renewal to be *sent* no later than the first of April, whereas the Teacher Tenure Act requires the written notice to be *received* by the first of April. Such a difference is of no matter here, however, because the non-renewal notice sent to the Plaintiff was timely under both the Agreement and the Teacher Tenure Act.

a non-tenured teacher's contract must be for "just cause."[4] Thus, even under the Teacher Tenure Statute, the Plaintiff would have had no "legitimate claim of entitlement" to the renewal of his employment contract. Therefore, the court finds that the Plaintiff had no property interest protected by the Fourteenth Amendment. Consequently, with regard to the Plaintiff's procedural due process claim, the Defendants' motion for summary judgment (dkt.# 31) is **GRANTED.**[5]

### 2. Substantive Due Process

■ "Substantive due process is an outer limit on the legitimacy of governmental action." *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999). The Supreme Court has emphasized that "the touchstone of due process is protection of the individual against arbitrary action of government . . . whether the fault lies in a denial of fundamental procedural fairness, . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis,* 523 U.S. 833, 845–

46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (internal citations and quotation marks omitted).

■ In order to prevail on a substantive due process claim, the plaintiff must first establish the existence of a "federally protectable property right," which requires a demonstration of a clear entitlement to a benefit under state law. *See Natale,* 170 F.3d at 263. Second, the plaintiff must demonstrate that "the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Benzman v. Whitman,* 523 F.3d 119, 126 (2d Cir.2008) (internal quotation marks omitted); *see Lewis,* 523 U.S. at 846–47, 118 S.Ct. 1708.

■ As the Second Circuit has noted, a plaintiff must show "not just that the action was literally arbitrary, but that it was arbitrary in the constitutional sense. Mere irrationality is not enough: only the most egregious official conduct, conduct that shocks the conscience, will subject the government to liability for a substantive due process violation based on executive

4. Unlike the Agreement, however, the Teacher Tenure Act provides that, *"[u]pon the teacher's written request,* a notice of nonrenewal or termination shall be supplemented within seven days after receipt of the request by a statement of the reason or reasons for such nonrenewal or termination." Conn. Gen.Stat. § 10–151(c) (emphasis added). If the statute were controlling here, the Plaintiff would have had a legitimate claim of entitlement to such a statement *provided that he specifically requested one.* First, the Plaintiff has presented no evidence that he did, in fact, request such a statement. Second, the record shows that on the same day the notice of non-renewal was sent (i.e., March 30, 2006), Hylwa sent to the Plaintiff a separate letter setting forth the reasons for the non-renewal. (*See* dkt. # 31, Ex. 16.) In the court's view, this letter complies with the statute's requirements. Third, although the statute can provide a legitimate claim of entitlement to a statement detailing the reasons for the non-renewal of a contract, it does not require that these rea-

sons constitute "just cause." Fourth, as the court has stated above, the Agreement, which did not require that such a statement be sent, controlled the employment relationship between the parties. Consequently, this portion of the statute does not support the Plaintiff's procedural due process claim.

5. The court also points out that, after receiving notice of the non-renewal of his contract, the Plaintiff requested, and received, the hearing to which he was entitled under the Agreement. This hearing was conducted within the time period required by the Agreement. Pursuant to the Agreement's terms, the Plaintiff was permitted to have his attorney at the hearing, and the Plaintiff and his attorney were allowed to present evidence. It appears to the court that the Plaintiff was afforded the process to which he was due under the Agreement, and the Plaintiff has not argued that the process set forth in the Agreement itself violates the standards of the Fourteenth Amendment's Due Process Clause.

action." *O'Connor v. Pierson,* 426 F.3d 187, 203 (2d Cir.2005) (internal quotation marks omitted). Although courts "tend to speak of that which 'shocks the conscience' largely in the context of excessive force claims .... it can apply to other areas of government activity as well." *Velez v. Levy,* 401 F.3d 75, 93–94 (2d Cir.2005) (internal citations omitted). " '[M]alicious and sadistic' abuses of power by government officials, intended to 'oppress or to cause injury' and designed for no legitimate government purpose, 'unquestionably shock the conscience.' " *Id.* at 94 (quoting *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 252 (2d Cir.2001)). The court uses the "shock the conscience" test because "our constitutional notion of due process rests on the bedrock principle that we must protect the individual 'against ... the exercise of power without any reasonable justification in the service of a legitimate governmental objective.' " *Id.* (quoting *Lewis,* 523 U.S. at 845–46, 118 S.Ct. 1708).

■■■ The Plaintiff's substantive due process claim fails as a matter of law. The Plaintiff claims that Defendants' conduct was so "outrageously arbitrary and shocking to the conscience" that it constituted a deprivation of his substantive due process rights. Nonetheless, the Plaintiff must first establish the existence of a "federally protectable property right." As the court found above when discussing the procedural due process claim, the Plaintiff had no constitutionally-protected property interest in the renewal of his employment contract with the DOE. Provided that notice was given in a timely fashion, the DOE could decide, with or without "just cause," to not renew the employment contract with the Plaintiff.

In addition, the court finds that the Plaintiff has failed to establish that any of the Defendants' actions constituted a gross abuse of governmental authority. There is

nothing indicating that the Defendants' behavior was "malicious and sadistic." Indeed, the possibility that the Plaintiff's contract would not be renewed was completely foreseeable, as it was a contingency specifically mentioned in the Agreement. Thus, the non-renewal of the contract, by itself, is insufficient to support a substantive due process claim. The Plaintiff submits no other evidence that the Defendants' conduct "unquestionably shocks the conscience." Therefore, the Plaintiff's substantive due process claim fails. Consequently, with regard to the Plaintiff's substantive due process claim, the Defendants' motion for summary judgment (dkt.# 31) is **GRANTED.**

### 3. Equal Protection

In the complaint, the Plaintiff asserts that "[n]o other teacher in the Connecticut Technical High School System has suffered adverse employment action [sic] because of his or her choice of a particular website for lawful electronic communications." (Dkt. # 1 ¶ 16.) The Plaintiff thus claims that the Defendants violated his right to equal protection under the Fourteenth Amendment.

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has held that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr. Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

■■■ "Traditionally, the Equal Protection clause of the Fourteenth Amendment protects against [classification-based] discrimination." *Goldfarb v. Town of West Hartford,* 474 F.Supp.2d 356, 366 (D.Conn. 2007) (internal quotation marks omitted). That is to say, the courts

apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose.... Classifications based on race or national origin ... and classifications affecting fundamental rights ... are given the most exacting scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy.

*Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (internal citations omitted). As the Second Circuit has pointed out, rational basis review generally applies, whereas the higher forms of review (i.e., strict scrutiny and intermediate scrutiny) apply in the "limited circumstances" where "the subject of the different treatment is a member of a class that historically has been the object of discrimination." *Able v. United States,* 155 F.3d 628, 631–32 (2d Cir.1998).

In this case, however, the Plaintiff does not base his equal protection claim pursuant to the "traditional," i.e., classification-based, equal protection analysis, nor does he argue that he has been discriminated against because he is a member of one of the classifications traditionally protected by strict or intermediate scrutiny under the Equal Protection Clause. Rather, he seems to rely on "two related, yet different, equal protection arguments." *Cobb v. Pozzi,* 363 F.3d 89, 109 (2d Cir.2004).

First, the Plaintiff appears to be asserting a "class-of-one" equal protection claim based on the Supreme Court's decision in *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Second, the Plaintiff seems to be asserting that he has been denied equal protection as a result of malicious or bad faith intent to injure him, i.e., a "malicious prosecution" equal protection claim based upon the Second Circuit's opinion in *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980). The court shall analyze both arguments in turn.

### a. *Olech* "Class–of–One"

In *Olech,* the Supreme Court recognized that successful class-of-one equal protection claims can be brought "where the plaintiff alleges that [ ]he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech,* 528 U.S. at 564, 120 S.Ct. 1073. Courts allow plaintiffs to bring class-of-one claims because "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.* (internal quotation marks omitted).

Up until June 9, 2008, it appears that the Plaintiff, based on Second Circuit precedent, could have brought a class-of-one equal protection claim against his former employer. *See Neilson v. D'Angelis,* 409 F.3d 100 (2d Cir.2005).[6] On June 9, 2008,

---

**6.** The court points out that the Honorable Mark R. Kravitz, in a prescient opinion, cast doubt on whether class-of-one claims were applicable to decisions made by public employers with regard to their employees. *See Pina v. Lantz,* 495 F.Supp.2d 290, 303–04 (D.Conn.2007). Nevertheless, Judge Kravitz noted that the Second Circuit's discussion of *Olech* in *Neilson,* although not definitively

holding so, suggested that *Olech* applied in the public employment context. *See id.* at 304. One of the plaintiffs' claims in Pina was a class-of-one claim in the context of public employment. *See id.* at 303 Because he was bound to follow the Second Circuit's lead, Judge Kravitz went on to analyze the plaintiffs' class-of-one claim. *See id.* at 304–09.

however, the Supreme Court explicitly held that "the class-of-one theory of equal protection does not apply in the public employment context." *Engquist v. Oregon Dept. of Agr.*, —— U.S. ——, 128 S.Ct. 2146, 2151, 170 L.Ed.2d 975 (2008). In differentiating the public employment context from other contexts (such as legislative or regulatory activity), the Supreme court noted that

> [t]here are some forms of state action ... which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise....
>
> This principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify.... Unlike the context of arm's-length regulation, such as in *Olech*, treating seemingly similarly situated individuals differently in the employment context is par for the course.

*Id.* at 2154. Thus, the Supreme Court concluded that "the class-of-one theory of equal protection-which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review-is simply a poor fit in the public employment context." *Id.* at 2155. "To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion

that typically characterizes the employer-employee relationship." *Id.*

Based on the holding in *Engquist*, the court must grant summary judgment in favor of the Defendants on the Plaintiff's class-of-one equal protection claim. Quite simply, such a claim in the context of public employment is no longer viable. Consequently, with regard to the Plaintiff's class-of-one equal protection claim, the Defendants' motion for summary judgment (**dkt.# 31**) is **GRANTED.**

> b. *LeClair* "Selective Prosecution"

■ In *LeClair*, the Second Circuit provided an equal protection argument whereby a plaintiff may bring an equal protection claim by demonstrating "selective prosecution." To succeed in an equal protection action based upon a selective prosecution, plaintiffs in this circuit must show both "(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir.2001) (internal quotation marks omitted); *see LeClair*, 627 F.2d at 609–10. The Second Circuit has warned, though, that "cases predicating constitutional violations on selective treatment motivated by ill-will, rather than by protected-class status or an intent to inhibit the exercise of constitutional rights, are lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply." *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir.2005) (internal quotation marks omitted). Indeed, the Second Circuit has "frequently referred to the *LeClair* formulation in [this] circuit, ... but

rarely [has] found a constitutional violation." *Id.* (collecting cases).

Given the Supreme Court's decision in *Engquist,* whether a *LeClair* selective prosecution claim in the public employment context can survive is doubtful. The Second Circuit has styled the *LeClair* selective prosecution theory as a species of class-of-one equal protection, and has even cited to *Olech* to "affirm[ ] the validity of such ... claims...." *Harlen Assocs.,* 273 F.3d at 499. The court discussed *Engquist* above, and need not repeat itself here. Needless to say, the Supreme Court found that the class-of-one theory of equal protection does not apply in the public employment context. In the court's view, this would apply not only to *Olech* class-of-one claims, but also to *LeClair* selective prosecution claims. Thus, the Plaintiff's claim here would be precluded, and summary judgment in favor of the Defendants must be granted.

■■■■ Even if *Engquist* did not apply to the Plaintiff's *LeClair* selective prosecution claim,[7] his claim would nonetheless fail as a matter of law. The Plaintiff has failed to compare himself to a similarly situated employee for the purposes of his selective prosecution equal protection claim. As this court has held previously, "demonstrating that a plaintiff has been treated differently from similarly situated individuals is 'the *sine qua non* of a *LeClair* "selective enforcement" violation.'" *Goldfarb v. Town of West Hartford,* 474 F.Supp.2d 356, 368 (quoting *John Doe No. 1 v. Village of Mamaroneck,* 462 F.Supp.2d 520, 555 (S.D.N.Y.2006)). The similarly situated standard here is the same as that for *Olech* class-of-one claims. "[T]he level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson,* 409 F.3d at 104. "[T]he standard

for determining whether another person's circumstances are similar to the plaintiff's must be ... whether they are *prima facie* identical." *Id.* at 105 (internal quotation marks omitted); *see Goldfarb,* 474 F.Supp.2d at 366–67; *Inturri v. City of Hartford,* 365 F.Supp.2d 240, 251 (D.Conn. 2005) (holding that, to be considered similarly situated, "employees must be similarly situated in all material respects").

■■■■ The Plaintiff has not met this standard. To support his claim, the Plaintiff was required to demonstrate that he was treated differently from other employees who were similarly situated to him in all material respects. "Although '[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury [,] ... [t]his rule is not absolute ... and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" *Goldfarb,* 474 F.Supp.2d at 367 (quoting *Harlen Assocs.,* 273 F.3d at 499 n. 2). There are two Emmett O'Brien teachers, Kate Benciavenga ("Benciavenga") and Cece Shepherd ("Shepherd"), to whom the Plaintiff compares himself. The Plaintiff alleges that Benciavenga and Shepherd both had MySpace accounts. Nevertheless, at his deposition, the Plaintiff testified that he did not know if either Benciavenga or Shepherd interacted with Emmett O'Brien students via MySpace. Moreover, the Plaintiff submits no evidence whatsoever with regard to Benciavenga's or Shepherd's activities on MySpace. The court thus fails to see how Benciavenga and Shepherd were similarly situated to the Plaintiff.

The Plaintiff asserts that "similarly situated" does not mean "having the same color eyes or being of the same sex."

---

**7.** The court is aware that *LeClair* selective prosecution claims, unlike *Olech* class-of-one claims, require a showing of malice or bad faith.

True as this may be, it is irrelevant to the analysis here. The Defendants' argument does not rest upon accidents of birth. Instead, the Defendants base their argument upon a comparison of the Plaintiff's conduct with Benciavenga's and Shepherd's conduct, which is highly relevant to this analysis.

The Plaintiff is correct that, in general, a determination that individuals are similarly situated is a factual issue for the jury. For the purposes of summary judgment, however, the Plaintiff must present admissible evidence that would allow a jury to come to such a conclusion. The fact that the Plaintiff, Benciavenga, and Shepherd, like many others, had MySpace accounts is not, by itself, sufficient to demonstrate that they were all similarly situated.[8] Instead, it is their conduct that is relevant.[9] Quite simply, the Plaintiff has provided nothing from which a jury could conclude that his conduct was in any way similar to Benciavenga's or Shepherd's. Because of this lack of evidence, no rational person could regard the circumstances of the Plaintiff to be similar to those to whom he compares himself. As a result, the Plaintiff's *LeClair* selective prosecution claim fails. Consequently, with regard to the Plaintiff's *LeClair* selective prosecution claim, the Defendants' motion for summary judgment (dkt.# 31) is **GRANTED.**

## C. FIRST AMENDMENT RETALIATION

The Plaintiff also asserts that the Defendants violated his First Amendment rights.

Specifically, the Plaintiff claims that the Defendants retaliated against him because he exercised his freedom of speech and freedom of association rights. The Defendants argue that both types of First Amendment claims fail as a matter of law.

### 1. Freedom of Speech

 The Plaintiff alleges that the Defendants retaliated against him for exercising his right to free speech. As the Second Circuit has held,

> a plaintiff making a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination.

*Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999); *see Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If a plaintiff produces evidence of these three elements, the government may nevertheless escape liability in one of two ways. "One way the government may prevail is by demonstrating by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech." *Mandell v. County of Suffolk,* 316 F.3d 368, 382 (2d Cir.2003). "Alternatively, the government may show that plaintiff's speech was likely

---

**8.** The court does not see how it could hold otherwise. Under the Plaintiff's reasoning, the court would have to hold, for example, that everybody with an email account is "similarly situated," no matter how or for what purpose the email accounts are used. Such a position is unsupportable.

**9.** The court also points out that the Plaintiff's argument with respect to his equal protection claim (i.e., that action was taken against him only because he had a MySpace profile page, not because of the page's contents or the Plaintiff's conduct on MySpace) appear to undercut his later First Amendment claim, where the Plaintiff argues that it was, in fact, the contents of his MySpace profile page that motivated the decision to not renew his contract.

to disrupt the government's activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech." *Id.* at 382–83. (internal quotation marks omitted.) "The question of whether certain speech enjoys a protected status under the First Amendment is one of law, not fact." *Morris,* 196 F.3d at 110.

 Before the Court reaches these issues, however, it must first address a preliminary question-whether the Plaintiff expressed his views as a citizen, or as a public employee pursuant to his official duties. The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos,* 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." *Id.* at 423, 126 S.Ct. 1951. "When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees." *Id.* at 424, 126 S.Ct. 1951. This holding is limited "only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints ... that are made outside the duties of employment." *Id.*

The parties have not specifically addressed this threshold question of whether the Plaintiff made his statements pursuant to his official duties. It is clear to the court, though, that the Plaintiff, when using his MySpace, was not acting pursuant to his responsibilities as a teacher. There is no indication in the record that the

Plaintiff, as a teacher, was under any obligation to make the statements he made on MySpace. Thus, the court finds that *Garcetti* does not extinguish the Plaintiff's First Amendment rights.

 Because *Garcetti* is not dispositive, the court next turns to the three-prong *prima facie* case of (1) public concern, (2) adverse employment action, and (3) causal connection. "Central to this inquiry is whether the speech may 'be fairly characterized as constituting speech on a matter of public concern.'" *Morris,* 196 F.3d at 110 (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). In general, "speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment." *Id.* (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. 1684). Nonetheless, as the Supreme Court has held,

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick,* 461 U.S. at 147, 103 S.Ct. 1684. The court must "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis v. Cowen,* 165 F.3d 154, 163–64 (2d Cir.1999). As noted by the Second Circuit, "expressing dissatisfaction with working conditions is not, by itself, speech on matters of public concern." *Tiltti v. Weise,* 155 F.3d 596, 603 (2d Cir.1998); *see Lewis,* 165 F.3d at 164 ("[S]peech on a purely private matter, such as an employee's dissatisfaction with

the conditions of his employment, does not pertain to a matter of public concern.").

The court notes that the contents of the Plaintiff's MySpace profile pages were varied. The profile page contained, *inter alia,* comments from the Plaintiff to other MySpace users, comments from other MySpace users to the Plaintiff, pictures, blogs, and poetry. The court, having reviewed the parties' submissions, concludes that almost none of the contents of the Plaintiff's profile page touched matters of public concern. The majority of the profile page consisted of personal conversations between the Plaintiff and other MySpace users or creative writing.

The only portion of the profile page that the Plaintiff argues is protected speech is a poem by the Plaintiff.[10] According the Plaintiff, his "opposition to the Iraq War ... was elegantly articulated" in this poem. The title of this entry on the profile page is "War poem (lyrics) whatever." The poem's lyrics read as follows:

The damage is done. No Where [sic] to run.

The sand and sun aren't any fun.

They rain down all day in the fields where soldiers lay [sic].

Their firearms held tightly.

Their steps fall lightly.

They watch for the enemy.

A man, woman or child they see.

He could be any of the three.

In houses they go hoping bombs won't explode.

For war of revenge that has no end.

The commander and [sic] chief much like a thief, will steal away at the dawn of the day.

But how many will die, for America's apple pie.

A slice of history that will remain a mystery.

The freedom we value is being stolen away, from a new people each and everyday [sic].

The soldiers then cry, watching friends die, defending our nation, they all find salvation.

They protect the peace and and [sic] continue to head East.

To a land of sand and sun, that isn't any fun and leaves them no where [sic] to run.[11]

(Dkt.# 31, Ex. 8.)

Leaving aside the question of whether one could call this bit of poetastry an "elegant articulation" of the current conflict in Iraq, the court concludes that, construing all ambiguities in favor of the Plaintiff, the poem could constitute a politi-

---

**10.** The Defendants also discuss an alleged telephone conversation the Plaintiff had with Druzolowski as being part of the Plaintiff's First Amendment claims. The court notes, however, that the Plaintiff does not argue in his opposition memorandum that this telephone conversation supports his First Amendment claims. The court thus considers abandoned any claims based on that conversation. *See Farrar,* 537 F.Supp.2d at 356. In addition, even if the court were to consider this telephone conversation, it would not be protected speech under the First Amendment. The record indicates that the telephone conversation concerned the Plaintiff's complaints or concerns about his work schedule. Such a conversation, whereby the Plaintiff expressed dissatisfaction with his working conditions, would concern matters only of personal, not public, interest, and hence would not be sufficient to support the Plaintiff's First Amendment claims. *See Connick,* 461 U.S. at 147, 103 S.Ct. 1684; *Lewis,* 165 F.3d at 164; *Tiltti,* 155 F.3d at 603.

**11.** The court has not altered the contents of the poem, but instead inserted "[sic]" to indicate a potential spelling or grammatical error that was present in the original. The court points out that these are only potential spelling and grammatical errors, for versifiers such as the Plaintiff often take poetic license with regard to language.

cal statement. That is, one could consider this poem to be an expression of the Plaintiff's opposition to the Iraq War. As such, it would be protected speech under the First Amendment.

 Because there is no question that the Plaintiff suffered an adverse employment action, the issue becomes whether there was a causal connection between the Plaintiff's poem and the decision to not renew his employment contract. "A plaintiff can establish the causal connection between protected expression and an adverse employment determination indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" *Cobb,* 363 F.3d at 108 (quoting *Morris,* 196 F.3d at 110). The Plaintiff presents no evidence of retaliatory animus, and there is nothing in the record to indicate that the Defendants intended to retaliate against the Plaintiff because of the political views expressed in his poem. Therefore, the Plaintiff has not established a causal connection directly.

 This leaves the indirect way of establishing a causal connection through the temporal proximity between the protected activity and the adverse action. In the court's view, the Plaintiff has not established this.[12] Given the nature of MySpace, the court assumes, for the purpose of this analysis, that the Defendants were aware of all the contents on the Plaintiff's profile page, including the poem. A review of the record indicates that the Plaintiff posted the poem on his "Mr. Spiderman" profile page on October 2, 2005. (*See* dkt. # 31, Ex. 8.) Based upon the parties' submitted undisputed facts, Michaud viewed the profile page shortly thereafter, presumably before October 14, 2005, the date that the Plaintiff created his "Apollo68" profile page after being told by

Michaud that the "Mr. Spiderman" page was inappropriate. The adverse action at issue is the non-renewal of the Plaintiff's employment contract, which occurred on March 30, 2006. Thus, the time period here spans approximately five and a half months.

The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001) (collecting cases). Although there is no such bright line rule, "courts in the Second Circuit have rejected finding a causal inference when there were gaps of four, five, or six months between the protected activity and the alleged retaliation." *Santisi v. South Huntington Union Free Sch. Dist.,* No. 03–CV–3847 DRH/MLO, 2006 WL 721320, at *7 (E.D.N.Y. Mar.17, 2006) (citing *Diaz v. Weill Med. Ctr. of Cornell Univ.,* No. 02 Civ. 7380, 2004 WL 285947, at *22 (S.D.N.Y. Feb.13, 2004) (collecting cases), *aff'd,* 138 Fed.Appx. 362 (2d Cir.2005)). As a result, the court finds that the five- to six-month interval, by itself, is insufficient to demonstrate causation. There is no additional evidence that the Plaintiff's poem played any part in the decision to not renew the Plaintiff's employment contract. The Defendants' correspondences with the Plaintiff did not mention the poem at all; rather, they focused on the Plaintiff's contact with Emmett O'Brien students on his MySpace profile page. The court finds that the Plaintiff has failed to establish the necessary causal connection between his exercise of the right to free speech and the allegedly retaliatory action taken against him.

12. There is no discussion of this temporal proximity at all by the Plaintiff.

■ Moreover, even if the Plaintiff had established this causal connection, the Defendants could still prevail by demonstrating by a preponderance of the evidence that they would have taken the same adverse action in the absence of the protected speech, or that the Plaintiff's speech was likely to disrupt school activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech. *See Mandell,* 316 F.3d at 382–83. In the court's view, the Defendants would have taken the same adverse action absent the existence of the poem on the Plaintiff's MySpace page. All the evidence indicates that the action taken against the Plaintiff resulted from his interactions with Emmett O'Brien students. There is no indication that the poem in any way played a part in the decision to not renew the Plaintiff's employment contract.

In addition, the Defendants have submitted evidence supporting the argument that the Plaintiff's conduct on MySpace, as a whole, was disruptive to school activities. One example of the Plaintiff's conduct is a November 22, 2005 exchange with a student, using the profile name "Byczko," that went as follows: [13]

> *Byczko:* "yo, hows it going sir? i figured i would leave a comment because i'm bored:)"
>
> *the Plaintiff:* "Things are going well for me. Sorry that you are bored. I'll see you tomorrow. If you ever call me sir again, you will be serving a detention sooooo long that your great grandchildren will have to finish it out. LOL"

> *Byczko:* "hey, i think thats a threat, u and me might have to fight!!! SIR!!! lol, see ya tomorrow!"
>
> *the Plaintiff:* "I would never threaten you. It's a straight out promise. I'll give you a choice you can serve detention until you've copied every page of every book in my room or you can stay from tomorrow until 11–22–3088"

(*Id.,* Exs. 11 & 12.) Another example is a November 25, 2005 exchange with a student, using the profile name "repko," that went as follows:

> *the Plaintiff:* "Repko and Ashley sittin in a tree. K I S S I N G. 1st comes love then comes marriage. HA HA HA HA HA HA HA!!!!!!!!!!!!!!!!!!!!!!!!! LOL"
>
> *repko:* "dont be jealous cuase you cant get any lol:)"
>
> *the Plaintiff:* "What makes you think I want any? I'm not jealous. I just like to have fun and goof on you guys. If you don't like it. Kiss my brass! LMAO"

(*Id.*)

In the court's view, it was not unreasonable for the Defendants to find that the Plaintiff's conduct on MySpace was disruptive to school activities. The above examples of the online exchanges the Plaintiff had with students show a potentially unprofessional rapport with students, and the court can see how a school's administration would disapprove of, and find disruptive, a teacher's discussion with a student about "getting any" (presumably sex), or a threat made to a student (albeit a facetious one) about detention.

**13.** The court has not altered the contents of this or any other exchange taken from the Plaintiff's MySpace profile page. The court takes notice that spelling and grammatical rules are not always closely followed in such casual or informal online exchanges, and that oftentimes certain phrases are abbreviated or expressed in a form of shorthand (e.g., "LOL" can mean "laughing out loud," and "LMAO" can mean "laughing my ass off"). Furthermore, such exchanges often contain so-called "emoticons," which are symbols used to convey emotional content in written or message form (e.g., ":)" indicates "smile" or "happy," and ":(" indicates "frown" or "sad").

Moreover, there is evidence of complaints about the Plaintiff's MySpace activities. For example, in her affidavit, Ford states that Emmett O'Brien students informed her of the Plaintiff's MySpace conduct, which made some of them "uncomfortable." (*See id.*, Ex. 21.) It is reasonable for the Defendants to expect the Plaintiff, a teacher with supervisory authority over students, to maintain a professional, respectful association with those students. This does not mean that the Plaintiff could not be friendly or humorous; however, upon review of the record, it appears that the Plaintiff would communicate with students as if he were their peer, not their teacher. Such conduct could very well disrupt the learning atmosphere of a school, which sufficiently outweighs the value of Plaintiff's MySpace speech.

In sum, the court finds that the Plaintiff has failed to establish a causal connection between his poem and the decision to not renew his employment contract. The court also finds that, even if such a causal connection were to exist, the Defendants would have taken the same adverse action even in the absence of the poem, and that the Plaintiff's speech was likely to disrupt school activities. As a result, the Plaintiff's First Amendment freedom of speech claim fails as a matter of law. Consequently, with regard to the Plaintiff's First Amendment freedom of speech claim, the Defendants' motion for summary judgment (dkt.# 31) is **GRANTED.**

### 2. Freedom of Association

"The First Amendment ... prohibits a state, as sovereign, from abridging an individual's right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends...." *Piscottano v. Murphy*, 511 F.3d 247, 268 (2d Cir.2007) (internal citations and quotation marks omitted). "[I]n order to prevail on a First Amendment freedom-of-expressive-association claim, a government employee must show ... that his expressive association involved a matter of public concern-just as would a government employee complaining of a violation of his right to freedom of speech." *Id.* at 273. A public employee must also show that he suffered an adverse employment action, and that a causal connection existed between the expressive association and the adverse employment action. *See Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir.2005).

With regard to whether one's association with an organization involves a matter of public concern, the Second Circuit has stated the following:

An individual's association with an organization can be deemed to involve expression on a matter of public concern in either of two ways. First, the organization itself may engage in advocacy on a matter of public concern. If it does, the individual's association with the organization may constitute, at least vicariously, expressive conduct on a matter of public concern.... Second, even where the organization itself does not purport to engage in advocacy on matters of public concern, the individual's association with the organization may-although it does not necessarily-constitute approval or an endorsement of the nature and character of the organization. Such approval or endorsement itself would constitute expressive conduct on a matter of public concern if the nature or character of the organization is a matter of public concern.

*Piscottano*, 511 F.3d at 274 (internal citations omitted).

The Plaintiff's argument with regard his freedom of association claim is not extensive. The court assumes that MySpace is the organization with which the Plaintiff

claims he was associated. The court begins by pointing out that it is unsure as to whether MySpace can properly be considered an "organization" for the purposes of this analysis. Although one must sign up to use MySpace, it does not constitute a specific group that people join. Rather, it is a means through which one can create an online community of friends, family, classmates, co-workers, etc. (*See* dkt. # 31, Ex. 2.) That is, MySpace is a medium through which people meet and have contact with other people. Presumably one could form an online organization that expresses itself on matters of public concern and interacts with organization members via MySpace. Such an organization, however, would not be MySpace itself.

■ Nevertheless, assuming for the sake of argument that MySpace could be considered an organization for First Amendment purposes, there is no evidence in the present case that MySpace, as an organization, purports to speak out on matters of public concern. Rather, MySpace invites its users to "[c]reate a *private* community . . . and . . . share photos, journals and interests with your growing network of mutual friends!" (*Id.*) (emphasis added). As a result, the Plaintiff's association with MySpace would not vicariously constitute expressive conduct on a matter of public concern. In addition, because the Plaintiff does not argue that MySpace's nature or character is a matter of public concern, the court fails to see the relevance of any approval or endorsement of MySpace via the Plaintiff's association with MySpace.

■ Notwithstanding the above, the court shall further assume the Plaintiff has demonstrated that his association with MySpace involved a matter of public concern. The Plaintiff would then still need

to show that a causal connection existed between the expressive association and the adverse employment action. This analysis is essentially the same as the causal connection analysis for the freedom of speech analysis, which failed as a matter of law and need not be restated here.[14] Thus, the court concludes that the Plaintiff's First Amendment freedom of association claim also fails as a matter of law. Consequently, with regard to the Plaintiff's First Amendment freedom of association claim, the Defendants' motion for summary judgment (**dkt.# 31**) is **GRANTED.**

### III. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment (**dkt.# 31**) is **GRANTED.** Judgment shall enter in favor of the Defendants on all claims in the complaint. The clerk shall close this file.

---

14. The court points out that the Plaintiff's freedom of association argument is undercut further by the fact that other Emmett O'Brien teachers had MySpace accounts, yet they apparently suffered no adverse action as a result of their association with MySpace.